Frank C. **BONURA**, Joseph J. **Guarascio**, Bernard **Lefkowitz** and Mary E. **Mousseau** as Executrix of the Estate of Joseph E. **Mousseau**, Plaintiffs,

v.

The **CHASE MANHATTAN BANK, N.A.,** Defendant.

No. 82 Civ. 4934(RJW).

United States District Court, S.D. New York.

Feb. 19, 1986.

Field, Lomenzo & Turret, P.C., New York City, for plaintiffs; Ira A. Turret,

Stephanie R. Schwartz, Kevin J. Nolan, of counsel.

Kent T. Stauffer, The Chase Manhattan Bank, N.A. Litigation Div., New York City, for defendant; Jeanne C. Miller, Laura Effel, of counsel.

ROBERT J. WARD, District Judge.

This is an action brought pursuant to the Age Discrimination in Employment Act of 1967 (the "ADEA" or the "Act") as amended, 29 U.S.C. § 621 *et seq.* At the conclusion of the trial on liability, the jury found that defendant, Chase Manhattan Bank N.A. ("Chase"), had willfully discriminated against each of the four plaintiffs on the basis of age, in violation of the Act. In a subsequent decision dated August 16, 1984, the Court ruled that plaintiff Lefkowitz had not presented sufficient evidence to warrant an equitable tolling of the 300-day time limit for filing a charge of age discrimination with the Equal Employment Opportunity Commission ("EEOC"). Accordingly, the Court dismissed Lefkowitz's claim for failure to file a timely age discrimination charge with the EEOC as required under 29 U.S.C. § 626(d)(2). With respect to the remaining three plaintiffs, the Court denied Chase's motion for judgment notwithstanding the verdict and directed the parties to complete discovery and submit a joint pretrial order on the issue of damages.

Following submission of the joint pretrial order on December 5, 1984 and a supplemental pretrial order dated January 7, 1985, the Court held a bench trial on the question of damages. At the conclusion of the trial, the Court apprised the parties of its tentative conclusions regarding certain of the issues raised in the proceeding. Based on these tentative conclusions, the parties conferred on the damage calculations that would follow, and made a final joint submission to the Court setting forth damage calculations for each remaining plaintiff. At the same time, plaintiffs made a separate submission setting forth alternative damage calculations based on certain of plaintiffs' proposed conclusions that had not tentatively been accepted by the Court.

The following constitute the Court's findings of fact and conclusions of law pursuant to Rule 52(a), Fed.R.Civ.P., on the issue of damages:

The Court adopts the stipulated facts set forth in the parties' joint pretrial order, as amended and augmented by the supplemental pretrial order dated January 7, 1985. As will be elaborated below, the court further adopts the proposed findings and calculations found in the parties' joint submission on damages, except with respect to the proposed finding on prejudgment interest. Plaintiffs' separate submission on damages is rejected.

### I. Back Pay

■ Having prevailed at trial on their claims that Chase terminated them on the basis of age in violation of the Act, plaintiffs can be awarded "reinstatement ...," with or without back pay ..., or any other equitable relief as the Court deems appropriate." 42 U.S.C. § 2000e-5(g). In calculating back pay, the Court may take into account any salary increases that plaintiffs could reasonably have expected to receive had they not been terminated for discriminatory reasons. *See Koyen v. Consolidated Edison Co.*, 560 F.Supp. 1161, 1164 (S.D. N.Y.1983). In addition to straight wages or salary, back pay awarded under the Act may include those benefits that would have accrued to plaintiffs in the course of their employment by defendant if they had not been discriminatorily discharged. Such benefits include, but are not limited to, profit sharing, vacation pay, medical benefits and pension benefits. *See Meyers v. I.T.T. Diversified Credit Corp.*, 527 F.Supp. 1064, 1070 (E.D.Mo.1981). At the same time, any back-pay award must be reduced by plaintiffs' interim earnings "or amounts earnable with reasonable diligence." 42 U.S.C. § 2000e-5(g).

### A. Length of Back-Pay Period

■ The Court rejects Chase's argument that its liability to plaintiffs ended or was otherwise diminished when Chase sold its

factoring department, the Credit Services Division ("CSD"), to the Commercial Credit Company ("CCC") effective June 30, 1983. It is true that prevailing plaintiffs under the Act may not recover damages for the period beyond which they would have been terminated for a nondiscriminatory reason. *Gibson v. Mohawk Rubber Co.*, 695 F.2d 1093, 1097 (8th Cir.1982). An award of lost wages may be limited, for example, to exclude the period after which the division in which the prevailing plaintiff worked was entirely eliminated. *E.g., Hill v. Spiegel, Inc.*, 708 F.2d 233, 238 (6th Cir.1983). The same result would not obtain, however, if the evidence showed that the plaintiff would have continued to hold a position within the defendant's enterprise, even if it is likely that he or she would have been transferred to another department or division of that organization. *E.g., Gibson, supra*, 695 F.2d at 1097–98. In this case, the evidence strongly suggests that plaintiffs would have retained their positions in the CSD even after it had been acquired by CCC, or else that Chase would have made reasonable efforts to relocate them in another of its own divisions.

At the trial on damages, David Goldberg, plaintiffs' former supervisor in the CSD, testified that he would not have recommended to CCC that it retain plaintiffs in the CSD after it acquired the division. It is undisputed, however, that Goldberg recommended to CCC that it continue to employ one hundred twenty-five of the one hundred eighty employees in Chase's CSD, including plaintiffs' successors, and that all were continued. Furthermore, Chase had sent a memorandum to all CSD employees advising them of the contemplated sale of the division. In the memorandum, which was admitted into evidence at trial, Chase assured its employees that if they did not remain with the CSD through the change in ownership, Chase would attempt to relocate them internally.

In view of the foregoing, the Court rejects Goldberg's testimony and concludes that, but for the discriminatory animus of Chase supervisory personnel, which the jury found at the liability stage of this case

to have been the true cause of plaintiffs' discharge, plaintiffs would have remained in the CSD or would have been relocated within the Chase organization after sale of the factoring division to CCC. Defendant has failed to demonstrate that plaintiffs would have been terminated solely as a consequence of the CSD sale, and therefore its liability to plaintiffs for their discriminatory discharge in 1981 does not end with the sale of the factoring division in June of 1983.

### B. Mitigation of Damages

■ The Court also rejects defendant's argument that its liability to plaintiff Bonura is diminished or eliminated entirely by Bonura's failure to mitigate his damages. An ADEA plaintiff has a duty to mitigate damages by using reasonable care and diligence in seeking suitable alternative employment. *Jackson v. Shell Oil Co.*, 702 F.2d 197, 201 (9th Cir.1983). The burden is on the defendant, however, to prove that plaintiff has failed in his duty to mitigate. *Coleman v. City of Omaha*, 714 F.2d 804, 808 (8th Cir.1983). Defendant's burden under the law of this circuit is extremely high. As Judge Weinfeld explained in the context of an action brought under the Civil Rights Act of 1964,

> defendant's burden of proving a lack of diligence is not satisfied merely by a showing that there were further actions that plaintiff could have taken in pursuit of employment. Rather, defendant must show that the course of conduct plaintiff actually followed was so deficient as to constitute an unreasonable failure to seek employment.

*EEOC v. Kallir, Philips, Ross, Inc.*, 420 F.Supp. 919, 925 (S.D.N.Y.1976), *aff'd*, 559 F.2d 1203 (2d Cir.), *cert. denied*, 434 U.S. 920, 98 S.Ct. 395, 54 L.Ed.2d 277 (1977).

■ Applying the above standard to plaintiff Bonura's conduct following his termination by Chase, the Court is satisfied that plaintiff met his obligation to make diligent efforts to obtain suitable alternative employment. Bonura testified at trial that, upon learning in late July 1981 that

he was about to be discharged by Chase, he began contacting individuals in the factoring industry to obtain leads on positions comparable to the high-level position he had held in Chase's factoring division. Bonura stated that the initial job search involved numerous telephone calls, luncheon appointments and meetings for drinks.

Having heard of no openings in factoring at a salary comparable to what he had been receiving at Chase, Bonura accepted a position at Gotham Bank, where he began working in October of 1981. Gotham Bank had no factoring division, however. Bonura's responsibilities at Gotham involved principally garnering new deposits and loans. In December of 1981, Bonura also formed ADM Consultants, Inc. ("ADM" or "ADM Consultants"). As the sole employee of that corporation, Bonura testified at trial, he performed on a commission basis essentially the same services he had rendered in the factoring division at Chase. Bonura later formed a second company, Business Capital Corporation ("BCC"), to manage or monitor accounts-receivable portfolios for companies and banks.

Bonura remained at Gotham Bank only until the beginning of April 1982. He testified at trial that he left Gotham Bank pursuant to "a mutual understanding." (Tr. 72) Thereafter, Bonura again sought leads on positions available in the factoring industry. Bonura's efforts to obtain suitable employment following his departure from Gotham Bank are documented by numerous affidavits and letters admitted into evidence at trial. Again, however, he located no factoring positions comparable in responsibility and compensation to the post he had left at Chase. As of the date of trial on damages, Bonura had not found employment within the factoring industry. To the best of the Court's knowledge, however, he continues to provide consulting services through ADM and BCC, the two companies he formed after his departure from Chase.

On the facts set forth above, there is little question in the Court's mind that plaintiff Bonura fulfilled his duty to exercise reasonable care and diligence in attempting to find suitable alternative employment. There are, undoubtedly, avenues leading to employment opportunities that Bonura did not pursue. Nevertheless, Bonura displayed persistence and resourcefulness in seeking comparable employment within the factoring industry, while at the same time expending personal energy and capital to develop his own consulting businesses. Chase has not demonstrated that Bonura's conduct "was so deficient as to constitute an unreasonable failure to seek employment," *Kallir, supra,* 420 F.Supp. at 925. Therefore, the damages Bonura may recover for Chase's wrongful conduct will not be limited on that account.

### C. Lost Salary

■ Plaintiffs are entitled to awards of lost salary for the period beginning December 31, 1981 (the day all three plaintiffs were taken off Chase's payroll) and ending February 9, 1984 for plaintiff Mousseau (the date of his death) and December 31, 1984 for plaintiffs Bonura and Guarascio (the date stipulated to by the parties as the commencement date for the trial on damages). The Court concludes further that, but for Chase's discriminatory conduct, plaintiffs would have received salary increases during those periods consistent with the pattern of salary increases they had received during the last two years of their employment at Chase. The parties therefore have calculated lost wages based on the historic pattern of salary increases for each respective plaintiff beginning September 1, 1979, and have projected these increases through September 1, 1983. Based on these calculations, plaintiffs are entitled to lost salaries in the following amounts:

| | |
|---|---|
| Bonura | 232,034.00 |
| Guarascio | 205,207.00 |
| Mousseau | 111,349.00 |

### D. Lost Profit Sharing

■ In addition to lost salary, plaintiffs are entitled to lost profit sharing under Chase's Thrift Incentive Plan ("TIP") for the same relevant periods. TIP awards are

calculated as a percentage of salary that Chase fixes after the close of each fiscal year. Based on the percentage Chase has used for the years 1981 through 1984, plaintiffs are entitled to lost TIP awards in the following amounts:

| | |
|---|---|
| Bonura | 27,855.00 |
| Guarascio | 24,630.00 |
| Mousseau | 14,325.00 |

### E. Lost Pension Benefits

Plaintiffs Bonura and Guarascio are also entitled to recover lost pension benefits assuming employment at Chase through December 31, 1984.[1] Having considered various forms of pension reimbursement, Bonura and Guarascio elect to receive lost pension benefits in the form of a lump sum equal to the cost of a joint and 100% survivor annuity necessary to generate those lost benefits. The parties' calculations yield awards in the following amounts:

| | |
|---|---|
| Bonura | 21,199.00 |
| Guarascio | 26,118.00 |

### F. Lost Fringe Benefits

One or more of plaintiffs seek additional fringe benefits as part of their back-pay award, including the cash value of lost vacation time, the replacement cost of disability, life and medical insurance, and cash bonuses for the years in question. The Court examines these claims in turn.

#### 1. *Vacation Pay*

With regard to compensation for lost paid vacation time, the parties agree that plaintiff Guarascio is entitled to an award of $3,881.00, and that plaintiff Mousseau is entitled to $3,907.00.

Bonura also seeks an award of vacation pay in the amount of $16,232.00, which Bonura estimates to be the value of eleven weeks' paid vacation that he lost during the relevant back-pay period. Chase contests Bonura's claim, arguing that Bonura is not entitled to be reimbursed for lost vacation time because, as president and sole employee of his own companies, Bonura may take vacations whenever he chooses.

On this issue, the Court accepts Chase's position. Ernesto Balsano, who works in Chase's employee benefits administration department, testified at trial that, although Chase employees accrue a certain number of weeks' paid vacation per year, they may not carry over unused vacation time into the next year, nor would Chase compensate them for any vacation they did not take within a given year. (Tr. 251–52) Therefore, the most Bonura could have lost as a result of his wrongful termination by Chase would be the value of the paid vacation to which he would have been entitled as a Chase employee during each year in question, but which he has not been entitled to take in his subsequent employment.

▪ The Court does not accept Chase's general assumption that, because Bonura is president of his own company, "he can take vacations as often as he likes...." Defendant's Memorandum on Damages at 27. Entrepreneurs and proprietors of small businesses are not necessarily able, financially or practically, to take vacations whenever they please. Nonetheless, Bonura has not established that, as president of ADM Consultants and Business Capital Corporation, he is not entitled to take at least as much vacation time as he was allowed while at Chase. Indeed, Bonura's testimony at trial concerning the generous perquisites ADM has provided to plaintiff and his family [2] persuades the Court that, if Bonura had wished to take several weeks' "paid vacation" during each year in question, he could have done so. If Bonura

---

1. The parties agree that plaintiff Mousseau's estate is not entitled to pension benefits because, had he remained in Chase's employ, Mousseau's right to receive pension benefits would not have vested by February 9, 1984, the date of his death.

2. These benefits include the repair of several home appliances, purchase of curtains for the home and clothing for Bonura, the purchase of a car *from* Bonura, payment of car expenses including parking violations, uninsured medical expenses including cab fare to doctors' offices, wedding and bar mitzvah gifts, country club dues, a land survey of plaintiff's home, and an interest-free loan to Bonura's son. (Tr. 73–80)

did not in fact take such vacations, the Court concludes that it is because he elected to take other types of fringe benefits from his consulting businesses. Because Bonura has not established a real loss of vacation time as result of Chase's wrongful termination, he is not entitled to additional compensation in that regard.

### 2. *Insurance*

One or more plaintiffs also seek to recover the replacement cost of insurance coverage that Chase would have provided had they remained in its employ during the relevant back-pay period. Chase does not dispute that insurance coverage is among the fringe benefits that a court may consider in calculating a back-pay award under the ADEA. Chase argues, however, that plaintiffs' recovery should be limited to their out-of-pocket expenses to purchase replacement coverage or, in the case of health insurance, to pay for medical care that would have been covered by Chase's group health insurance plan.

Where a successful plaintiff in an age discrimination action has purchased substitute insurance coverage after being terminated by the defendant, or has incurred, for example, uninsured, out-of-pocket medical expenses for which he or she would have been reimbursed under the defendant's insurance plan, district courts have had little difficulty in compensating the plaintiff for the losses incurred. *See, e.g., EEOC v. United Airlines, Inc.,* 575 F.Supp. 309, 311 (N.D.Ill.1983), *rev'd on other grounds,* 755 F.2d 94 (7th Cir.1985); *Merkel v. Scovill, Inc.,* 570 F.Supp. 141, 146 (S.D.Ohio 1983); *cf. Kallir, supra,* 420 F.Supp. at 924 (Civil Rights Act case).

Where the plaintiff has neither purchased substitute insurance coverage nor incurred expenses that would have been reimbursable under the defendant's insurance plan, however, courts have varied in their approaches. One district court, ruling on post-trial motions in an age discrimination case, rejected the defendant's argument—identical to that put forward by Chase in this action—that the plaintiff's

recovery of lost insurance benefits should be limited to the plaintiff's actual expenditures for replacement insurance coverage or for an uninsured loss that would have been covered by the defendant's insurance program. "The insurance benefits plaintiff lost [as a result of her wrongful termination by the defendant]," the court held, "are not any less of a monetary benefit to her because she could not afford to replace her insurance benefits or because she did not become sick." *Jacobson v. Pitman-Moore, Inc.,* 582 F.Supp. 169, 179 (D.Minn. 1984). The Minnesota district court therefore upheld a jury award that included the cost of replacing insurance benefits that the defendants had provided. A greater number of courts, however, have refused to award plaintiffs any compensation for lost insurance benefits where the plaintiffs have not purchased substitute coverage or suffered any insured losses following their termination. *See, e.g., Syvock v. Milwaukee Boiler Mfg. Co., Inc.,* 665 F.2d 149, 161 (7th Cir.1981); *Buchholz v. Symons Mfg. Co.,* 445 F.Supp. 706, 713 (E.D.Wis.1978).

Something of a compromise between these two positions was suggested in a recent opinion of the Fourth Circuit Court of Appeals, involving the entitlement of an ADEA plaintiff's surviving spouse to life insurance benefits under the Act. The circuit panel affirmed the district court's grant of summary judgment to the defendant employer in that case, holding initially that the spouse, even if successful in proving liability under the Act, could not recover the value of life insurance *proceeds* that would have flowed to her had her husband died still in the defendant's employ and therefore covered by the life insurance plan purchased by the defendant for its employees. The circuit court reasoned that "[the] insurance coverage, not the proceeds, is the benefit for which the employer must be held liable." *Fariss v. Lynchburg Foundry,* 769 F.2d 958, 965 (4th Cir.1985). The court then went on to discuss the value of the insurance coverage for which a plaintiff might be compensated under the Act.

Where a wrongfully terminated employee buys substitute insurance, the circuit court acknowledged, "the 'make whole' concept underlying ADEA damages would permit full recovery of any additional premiums for the comparable individual policy beyond what the employer would have paid for group insurance." *Id.* at 966 (citation omitted). Where, however, there is no evidence that the plaintiff has attempted to obtain substitute coverage, the court opined that the plaintiff should be able to recover only the value of the premiums the employer would have paid. *Id. Accord Worsowicz v. Nashua Corp.*, 612 F.Supp. 310, 313 (D.N.H.1985) (executrix of ADEA plaintiff's estate entitled at most to recover the cost to defendant employer of providing life insurance coverage); *cf. Loubrido v. Hull Dobbs Co. of Puerto Rico, Inc.*, 526 F.Supp. 1055, 1059 (D.P.R.1981) (back-pay award under ADEA to terminated truck sales manager included amount defendant employer had paid for car insurance). The Fourth Circuit's opinion therefore suggests that, although a plaintiff may not recover the cost of replacing insurance coverage unless he or she has actually purchased a replacement policy, a plaintiff may at least recover the cost to the defendant of providing insurance for the employee.

■ In the instant case, the Court need not determine whether, under other circumstances, plaintiffs should be entitled to recover the replacement cost of insurance formerly provided by Chase even though plaintiffs have not obtained substitute coverage themselves. *Cf. Fariss, supra,* 769 F.2d at 966 (court left open question of proper measure of damages where plaintiff had "earnestly attempted to procure substitute individual coverage and found insurance unavailable for a person of his age and health"). Nor does the Court expressly accept or reject the Fourth Circuit's suggestion in *Fariss, supra,* that the proper measure of damages in cases where a plaintiff has not attempted to procure substitute insurance coverage is the cost to the defendant employer of providing the insurance. The Court simply holds that, in the instant case, plaintiffs have not established

cognizable losses with respect to their disputed claims for lost insurance benefits, and therefore are not entitled to additional compensation for those items.

Plaintiff Bonura seeks an award of $5,706.00, which he estimates is the replacement cost of disability income protection Chase would have provided during the relevant back-pay period. Bonura produced no evidence that he had purchased replacement disability insurance for the relevant period. The Court takes note again, however, of the generous benefits ADM Consultants has provided to Bonura and his family since Bonura formed that corporation in December of 1981. *See supra* at 359 & note 2. The Court concludes that, had plaintiff desired to obtain comparable disability coverage following his termination from Chase, ADM Consultants could have provided such coverage for him. As the Court observed above in connection with Bonura's claim for vacation pay, plaintiff apparently has preferred to take fringe benefits from his consulting businesses in other forms.

Both Bonura and Mousseau also claim losses of life insurance coverage provided by defendant. It is undisputed that neither plaintiff purchased replacement coverage following his departure from Chase. Moreover, neither availed himself of the opportunity offered to all terminated Chase employees to convert their group medical and life insurance coverage to individual policies without the necessity of a physical examination within thirty-one days of termination. In view of the foregoing, the Court concludes that neither plaintiff has demonstrated a loss of life insurance benefits that is cognizable under the Act. Neither plaintiff seeks to be reimbursed for the purchase of substitute life insurance coverage. Furthermore, even if the Court were to hold that plaintiffs nonetheless suffered some loss of life insurance protection, *cf. Jacobson, supra,* 582 F.Supp. at 179, plaintiffs' failure to mitigate their loss by converting their life insurance policies upon termination from Chase precludes Bonura and Mousseau from now recovering the

replacement cost of the life insurance coverage Chase provided.

Finally, plaintiff Guarascio seeks to be reimbursed for $3,700.00 in out-of-pocket medical expenses for which he was not reimbursed under the health insurance plan provided by his current employer, but which he contends would have been reimbursable under the Chase plan. Upon a proper showing, such expenses would be fully compensable under the Act. *See supra* at 359–360. However, the only evidence offered by plaintiff in support of his claim was his oral testimony at trial that he had paid certain expenses for his wife's medical care and that those expenses would have been covered by Chase's employee health plan. Guarascio presented no documentation of the expenses he testified he had incurred, nor did he offer any evidence to substantiate his contention that such expenses would have been reimbursable under Chase's group health coverage. Plaintiff's oral testimony, without more, does not establish his entitlement to compensation for the loss he claims.

### 3. *Bonuses*

■ Finally, all three plaintiffs seek to be compensated for the bonuses they contend they would have received from Chase during the relevant backpay period. Plaintiffs do not attempt to calculate likely bonuses for the years in question, but leave such calculation to the discretion of the Court.

The parties stipulated before trial that the bonuses Chase had paid plaintiffs during their periods of employment had not been mandatory, and that plaintiffs did not receive a bonus in each year of their employment. Chase argues, in view of these stipulated facts, that any calculation of lost bonus awards would be entirely speculative and therefore inappropriate. On the facts of this case, the Court agrees. By leaving the issue of bonus awards entirely to the Court's discretion, plaintiffs as much as concede that any calculations in this area would be the product of speculative hindsight. In its discretion, the Court declines to engage in such rear-view fortunetelling.

To summarize the Court's findings on lost fringe benefits, plaintiffs Guarascio and Mousseau are entitled to lost benefits (specifically, the cash value of lost vacation time) in the following amounts:

| | |
|---|---|
| Guarascio | 3,881.00 |
| Mousseau | 3,907.00 |

### G. Interim Earnings

The parties are in virtual agreement as to the amount of interim earnings that should be deducted from each plaintiff's gross back-pay award. On those points that remain in dispute, the Court adheres to its tentative conclusions expressed at the close of trial.

■ First, the Court rejects Chase's argument that plaintiff Bonura's interim earnings should be increased or "grossed up" to reflect the tax benefit to him of certain personal expenses that were paid by ADM Consultants. As the Court remarked at trial, the particulars of defendant's theory were not adequately proven. Furthermore, as was brought out on cross-examination of defendant's witness, Anita Forgash, the calculations the witness had prepared in anticipation of trial failed to take into consideration the tax consequences of other events such as Bonura's premature withdrawal of funds from an individual retirement account.

■ Second, the Court in its discretion declines to subtract from plaintiff Mousseau's gross back-pay award the amount he received in unemployment insurance benefits following his involuntary departure from Chase. *Accord McDowell v. Avtex Fibers, Inc.*, 740 F.2d 214, 215–17 (3d Cir. 1984), *vacated and remanded on other grounds*, —— U.S. ——, 105 S.Ct. 1159, 84 L.Ed.2d 312 (1985); *EEOC v. Sandia Corp.*, 639 F.2d 600, 624–26 (10th Cir.1980). *Cf. Craig v. Y & Y Snacks, Inc.*, 721 F.2d 77, 81–85 (3d Cir.1983); *Brown v. A.J. Gerrard Mfg. Co.*, 715 F.2d 1549, 1550 (11th Cir.1983) *(en banc) (per curiam); Kauffman v. Sidereal Corp.*, 695 F.2d 343, 346–47 (9th Cir.1983) *(per curiam); EEOC v. Ford Motor Co.*, 645 F.2d 183, 195–96 (4th

Cir.1981), *rev'd on other grounds*, 458 U.S. 219, 102 S.Ct. 3057, 73 L.Ed.2d 721 (1982), *adhered to original position on remand*, 688 F.2d 951, 952 (4th Cir.1982) (*per curiam*) (Title VII cases); *but see EEOC v. Enterprise Ass'n Steamfitters Local No. 638*, 542 F.2d 579, 591–92 (2d Cir.1976), *cert. denied*, 430 U.S. 911, 97 S.Ct. 1186, 51 L.Ed.2d 588 (1977) (although weight of common law authority would support refusal to deduct "public assistance" from Title VII back-pay award, district court's offset of unemployment compensation held "[a]s a matter of policy" not to be abuse of discretion).

The parties' calculations of interim earnings for each plaintiff yield the following:

| | |
|---|---|
| Bonura | 134,299.00 |
| Guarascio | 176,334.00 |
| Mousseau | 100,249.00 |

### H. Net Awards

Based on the figures set forth above, the Court calculates plaintiffs' respective net back-pay awards as follows:

#### Bonura

| | |
|---|---|
| Salary Loss | 232,034.00 |
| TIP Loss | 27,855.00 |
| Pension Loss | 21,199.00 |
| | 281,088.00 |
| Interim Earnings | −134,299.00 |
| Net Back-Pay Award | $146,789.00 |

#### Guarascio

| | |
|---|---|
| Salary Loss | 205,207.00 |
| TIP Loss | 24,630.00 |
| Pension Loss | 26,118.00 |
| Vacation Loss | 3,881.00 |
| | 259,836.00 |
| Interim Earnings | −176,334.00 |
| Net Back-Pay Award | $ 83,502.00 |

#### Mousseau

| | |
|---|---|
| Salary Loss | 111,349.00 |
| TIP Loss | 14,325.00 |
| Vacation Loss | 3,907.00 |
| | 129,581.00 |
| Interim Earnings | −100,249.00 |
| Net Back-Pay Award | $ 29,332.00 |

## II. Liquidated Damages

Because the jury found that Chase had willfully discriminated against plaintiffs in violation of the Act, plaintiffs are further entitled to an award of liquidated damages equal to the amount of their respective back-pay awards. 29 U.S.C. § 626(b); *see Trans World Airlines, Inc. v. Thurston*, —— U.S. ——, 105 S.Ct. 613, 624, 83 L.Ed.2d 523 (1985). A doubling of the net back-pay awards calculated above yields the following total awards [3] for each plaintiff:

---

**3.** Plaintiffs Bonura and Guarascio seek, in addition to back pay and liquidated damages, an award of front pay to age seventy. In *Whittlesey v. Union Carbide Corp.*, 742 F.2d 724 (2d Cir.1984), the Second Circuit stated that "front pay is, in limited circumstances, an appropriate remedy under the ADEA." *Id.* at 729. *Accord Wildman v. Lerner Stores Corp.*, 771 F.2d 605 (1st Cir.1985); *EEOC v. Prudential Fed. Savings & Loan Ass'n*, 763 F.2d 1166, 1172–73 (10th Cir.), *cert. denied*, —— U.S. ——, 106 S.Ct. 312, 88 L.Ed.2d 289 (1985); *Goldstein v. Manhattan Inds., Inc.*, 758 F.2d 1435, 1448–49 (11th Cir.), *cert. denied*, —— U.S. ——, 106 S.Ct. 525, 88 L.Ed.2d 457 (1985); *Davis v. Combustion Engineering, Inc.*, 742 F.2d 916, 922–23 (6th Cir. 1984).

Upholding the district court's award of four years' front pay to a successful ADEA plaintiff, the circuit court in *Whittlesey* delineated the "limited" set of circumstances under which a front-pay award would be appropriate. An award of front pay presupposes, first, that reinstatement is either impossible or impracticable. *See* 742 F.2d at 729. Second, a front-pay award

is appropriate and may even be necessary "in cases where the factfinder can reasonably predict that the plaintiff has no reasonable prospect of obtaining comparable alternative employment." *Id.* Finally, front pay may properly be awarded where calculation of both the plaintiff's likely mitigated earnings and the income the plaintiff likely would have earned if he or she had continued in the defendant's employ do not involve "undue speculation." *Id.* In *Whittlesey*, the circuit court noted both the plaintiff's high-level position at Union Carbide at the time of his termination and the few years remaining until the plaintiff would have been mandatorily retired by Union Carbide without violating the Act. On these facts, the appeals court concluded that the district court could have awarded front pay without speculating unduly "either as to the possibility of mitigation, or as to the amount [the plaintiff] would have made at Union Carbide had he not been fired." *Id.* The circuit panel noted in particular that [t]he time period [involved] was relatively short, approximately four years, and thus did not involve

| | |
|---|---|
| Bonura | $293,578.00 |
| Guarascio | 167,004.00 |
| Mousseau | 58,664.00 |

### III. Prejudgment Interest

Finally, plaintiffs seek prejudgment interest on their back-pay awards,[4] to be calculated at the "adjusted prime rate" established by the Secretary of the Treasury. Plaintiffs acknowledge, however, that the

some of the uncertainties which might surround a front pay award to a younger worker." *Id.* Following the guidelines provided by the Second Circuit in *Whittlesey, supra,* this Court concludes that additional awards of front pay are neither necessary nor appropriate for plaintiffs Bonura and Guarascio. With regard to the first *Whittlesey* factor, impossibility of reinstatement, both plaintiffs and defendant appear to assume that reinstatement is impracticable. Under the circumstances, the Court finds the parties' assumption to be well-founded. Plaintiffs could not be restored to their former positions in the CSD because Chase sold that division in 1983. Furthermore, even assuming there were comparable positions in other of Chase's departments that plaintiffs could fill, the Court would be chary to order plaintiffs' placement in such positions in view of the hostility evidenced between plaintiffs and Chase supervisory personnel at both the liability and damages stages of this litigation.

Unquestionably, plaintiffs and their families have suffered financial hardship as a consequence of Chase's discriminatory conduct. Even so, under the second *Whittlesey* factor, the Court finds neither plaintiff to be an individual with "no reasonable prospect of obtaining comparable alternative employment." 742 F.2d at 729. The Court determined earlier that plaintiff Bonura had adequately mitigated his damages by making efforts to find comparable employment after leaving Chase. However, simply because Bonura was not offered a position in the factoring industry commensurate with his income and responsibilities at Chase does not mean that Bonura lacks opportunities to engage in comparable alternative employment. In discussing Bonura's efforts to mitigate, the Court took special note above of Bonura's efforts to parlay his factoring skills into his own consulting businesses. While neither ADM Consultants nor Business Capital Corporation has provided Bonura with a financial gold mine, ADM's gross earnings have shown substantial increases from year to year. Indeed, there is every indication that this trend will continue as Bonura draws further on his expertise in factoring to enhance the consulting services he now offers. In sum, Bonura's success in the short term in setting up a consulting business within the factoring field negates the argument that Bonura should receive front pay because he has no reasonable prospects for engaging in alternative employment comparable to his former activities at Chase.

Guarascio, for his part, found comparable, though not identical, employment following his termination from Chase at Security Pacific Business Credit Corporation, where he has remained to date. Guarascio's starting salary at Security Pacific was somewhat less than the salary he was drawing when he left Chase, but he has since received several moderate salary increases at Security Pacific, and garners many if not most of the fringe benefits he enjoyed at Chase. Guarascio, therefore, also is not an ADEA plaintiff entitled to a front-pay award because he has "no reasonable prospect of obtaining comparable alternative employment." *Id.*

Even if the Court were persuaded that some award of front pay was necessary to make plaintiffs whole, under the third *Whittlesey* factor, the Court would hesitate to grant plaintiffs the front pay they seek because of the amount of speculation that necessarily would enter into the Court's calculations. Bonura, age fifty-nine, and Guarascio, fifty-four, seek front-pay awards to age seventy, or for periods of eleven and sixteen years respectively. The front-pay periods contemplated here are far greater than the four-year period involved in *Whittlesey* and, in this Court's estimation, import the very "uncertainties" the Second Circuit found absent in that case. *See* 742 F.2d at 729. In Bonura's case, for example, considerable speculation would enter into the estimate of his likely mitigated earnings to age seventy because neither of his consulting businesses has a proven track record. In Guarascio's case as well, speculation would enter into the Court's calculations simply by virtue of the sixteen-year period over which it would be necessary to project both Guarascio's likely future income stream had he remained at Chase and the stream of income he will receive assuming he remains at Security Pacific until age seventy.

Where, as here, the Court is not persuaded in the first place that plaintiffs require front pay in order to be made whole, it would be particularly inappropriate to speculate as to what plaintiffs' future earnings could or should be. Based on its appraisal of plaintiffs' respective employment opportunities, as well as the periods of front pay sought and the speculative projections that calculation of such front-pay awards would require, the Court declines to award front pay either to Bonura or Guarascio.

---

**4.** Bonura's and Guarascio's additional claim for prejudgment interest on any front-pay award is rendered moot by the Court's decision not to award front pay to either plaintiff.

Second Circuit has yet to address the question of whether prejudgment interest may be awarded at the same time as liquidated damages. *See Goodman v. Heublein, Inc.*, 682 F.2d 44, 47 n. 2 (2d Cir.1982) (circuit panel did not reach issue of whether prejudgment interest award was precluded by award of liquidated damages where plaintiff's motion for prejudgment interest had not been timely made). Moreover, plaintiffs concede that, of the circuit courts that have addressed the question, only the Ninth Circuit has held that prejudgment interest can be awarded together with liquidated damages. *See Criswell v. Western Airlines, Inc.*, 709 F.2d 544, 556–57 (9th Cir.1983), *aff'd on other grounds*, —— U.S. ——, 105 S.Ct. 2743, 86 L.Ed.2d 321 (1985); *contra O'Donnell v. Georgia Osteopathic Hosp., Inc.*, 748 F.2d 1543, 1552 (11th Cir. 1984); *Blim v. Western Elec. Co., Inc.*, 731 F.2d 1473, 1479–80 (10th Cir.), *cert. denied*, —— U.S. ——, 105 S.Ct. 233, 83 L.Ed.2d 161 (1984); *Rose v. National Cash Register Corp.*, 703 F.2d 225, 230 (6th Cir.), *cert. denied*, 464 U.S. 939, 104 S.Ct. 352, 78 L.Ed.2d 317 (1983); *Gibson, supra*, 695 F.2d at 1101–03; *Kolb v. Goldring, Inc.*, 694 F.2d 869, 875 (1st Cir.1982); *Spagnuolo v. Whirlpool Corp.*, 641 F.2d 1109, 1114 (4th Cir.), *cert. denied*, 454 U.S. 860, 102 S.Ct. 316, 70 L.Ed.2d 158 (1981); *see also EEOC v. Colgate-Palmolive Co.*, 612 F.Supp. 1476, 1480–81 (S.D.N.Y.1985); *cf. Heiar v. Crawford County*, 746 F.2d 1190, 1202 (7th Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 3500, 87 L.Ed.2d 631 (1985) ("[i]f liquidated damages had been awarded, it could be argued that an award of prejudgment interest would be duplicative").[5]

Those circuit courts that have declined to award both liquidated damages and prejudgment interest in ADEA cases have be-

gun their analysis by observing that the remedial section of the ADEA, 29 U.S.C. § 626(b), incorporates the liquidated damages provision of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b). In cases brought under the FLSA, courts have held that prejudgment interest in addition to full liquidated damages is not recoverable under that statute because the liquidated damages authorized under the FLSA are intended to compensate plaintiffs for delay in payment of sums due under that Act. Thus, "[t]o allow an employee to recover the basic statutory wage and liquidated damages, with interest, would have the effect of giving an employee double compensation for damages arising from delay in the payment of the basic minimum wages." *Brooklyn Savings Bank v. O'Neil*, 324 U.S. 697, 715, 65 S.Ct. 895, 906, 89 L.Ed. 1296 (1945); *see also Masters v. Maryland Mgt. Co.*, 493 F.2d 1329, 1334 (4th Cir. 1974); *cf. McClanahan v. Mathews*, 440 F.2d 320 at 326 (prejudgment interest should be recoverable in FLSA action where district court awards less than maximum amount of liquidated damages).

Some circuits have simply accepted the Supreme Court's holding in *Brooklyn Savings Bank, supra*, as conclusive of the issue under the ADEA as well. The Sixth Circuit, for example, has held that "[i]nasmuch as Congress incorporated the remedies of the FLSA into the ADEA and, since 'Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law,' ... the rule of *Brooklyn Savings Bank* [ ] is applicable to ADEA actions." *Rose, supra*, 703 F.2d at 230 (citation omitted); *see also Spagnuolo, supra*, 641 F.2d at 1114.

Other circuits have extended the analysis further to examine the purpose of liquidated damages under the ADEA. In *Gib-*

**5.** Although not presented with the question in *Heiar*, Judge Posner intimated that a district court might nonetheless have the power to award prejudgment interest as well as liquidated damages where the court had decided to award less than full (double) liquidated dam-

ages and the total award did not exceed double damages. 746 F.2d at 1202; *accord Gibson, supra*, 695 F.2d at 1102 n. 9; *cf. McClanahan v. Mathews*, 440 F.2d 320, 325–26 (6th Cir.1971) (FLSA case).

*son, supra*, for example, the Eighth Circuit's reading of the relevant legislative history persuaded it that

> liquidated damages under the ADEA, like prejudgment interest, are intended to provide compensation for losses that cannot be calculated with certainty, such as the value attributable to the loss of use of unpaid wages after an employee has been unlawfully discharged. Accordingly, in order to prevent double recovery, successful plaintiffs are not entitled under the ADEA, as well as under the FLSA, to obtain both liquidated damages and prejudgment interest absent exceptional circumstances.

695 F.2d at 1102. *Accord O'Donnell, supra*, 748 F.2d at 1552; *Blim, supra*, 731 F.2d at 1479; *see also Colgate-Palmolive, supra*, 612 F.Supp. at 1480–81.

In *Criswell, supra*, the Ninth Circuit also examined the purposes underlying awards of liquidated damages and prejudgment interest under the ADEA, but reached a different conclusion:

> [L]iquidated damages and prejudgment interest serve different functions in making ADEA plaintiffs whole. Liquidated damages are "a substitution for punitive damages and [are] intended to deter intentional violations of the ADEA." [*Kelly v. American Standard*, 640 F.2d 974 (9th Cir.1981).] Prejudgment interest is intended to compensate "the loss of use of this money during the period payments [are] withheld from [ADEA plaintiffs]." *Id.* at 982.

709 F.2d at 556–57. Because the district court had awarded prejudgment interest only on that portion of the plaintiffs' damages representing back pay, "the plaintiffs' actual loss," the circuit panel held that the lower court had properly exercised its equitable powers by awarding prejudgment interest. *Id.* at 557.

In *Trans World Airlines, Inc. v. Thurston, supra*, the Supreme Court recently confronted, not the issue directly posed here, but the general question of "what constitutes a 'willful' violation of the ADEA, entitling a plaintiff to 'liquidated' or double damages." 105 S.Ct. at 618. In order to determine the appropriate standard for a finding of willfulness in age discrimination cases, the Court in *Thurston* examined the legislative purpose behind the ADEA's provision for liquidated damages. The Court acknowledged, first, that the ADEA's remedial section provides for enforcement of rights under the Act "in accordance with the powers, remedies, and procedures [of the Fair Labor Standards Act]." 29 U.S.C. § 626(b); *see* 105 S.Ct. at 623–24. The Court noted, however, that while liquidated damages are mandatory under the FLSA, a prevailing ADEA plaintiff can recover liquidated damages "only in cases of willful violations." 29 U.S.C. § 626(b); *see* 105 S.Ct. at 624. Furthermore, the Court's reading of "[t]he legislative history of the ADEA indicate[d] that Congress intended for liquidated damages to be punitive in nature." *Id.* The Supreme Court therefore held that mere knowledge on the part of a defendant employer of the ADEA's potential applicability would be insufficient to establish willfulness. Rather, a plaintiff must prove "reckless disregard" of the Act's requirements by the defendant in order to establish willful misconduct under the Act. *Id.*

■ The Supreme Court's analysis in *Thornton* makes clear that the primary purposes of liquidated damage awards under the ADEA are to punish errant employers and to deter other potential violators of the Act. The principal purpose is not, as several circuits have assumed, "to provide compensation for losses that cannot be calculated with certainty." *Gibson, supra*, 695 F.2d at 1102. It follows, therefore, that prejudgment interest does not provide a double recovery to victims of age discrimination who have proven their entitlement to liquidated damages as well as back pay. Prejudgment interest, as the Ninth Circuit observed in *Criswell, supra*, serves an entirely different purpose from liquidated or

punitive damages. It acts solely to compensate the ADEA plaintiff for the loss of the use of money owed to him or her by the defendant employer. *See* 709 F.2d at 556–57.[6] In view of the Supreme Court's clarification in *Thornton* of the purposes underlying liquidated damage awards under the ADEA, this Court concludes that the Ninth Circuit's reasoning in *Criswell* is persuasive, and that prejudgment interest may properly be awarded in the instant case, where the jury's finding of willful discrimination entitles plaintiffs to an award of liquidated damages in addition to back pay.[7]

At the close of the trial on damages in this action, the Court expressed reluctance to award plaintiffs prejudgment interest as well as liquidated damages. In view of the foregoing, however, the Court now is satisfied that plaintiffs properly may recover prejudgment interest on their respective back-pay awards, to be calculated from the date on which the jury verdict was entered until the date of judgment. Because the Court was not originally disposed to award prejudgment interest, the parties did not consider in their post-trial submissions on damages the rate of interest the Court properly should use to calculate such an award. In their proposed judgments to be settled on notice, therefore, the parties shall include calculations of the prejudgment interest due, using the rate or rates they consider most appropriate under the circumstances.

Settle judgment on notice.

6. From the defendant's perspective as well, an award of prejudgment interest does not impose an additional penalty on the errant employer, but merely requires the defendant to part with the benefit it derived or could have derived from putting the plaintiff's money to use until the time judgment was entered.

7. Even if one were to assume that liquidated damages under the ADEA serve partly to compensate the plaintiff in addition to punishing the defendant and deterring others, this Court still would not be persuaded that an award of prejudgment interest necessarily provides the plaintiff with a double recovery. The Eighth Circuit in *Gibson, supra,* opined that liquidated damages "provide compensation for losses that cannot be calculated with certainty," 695 F.2d at 1102, but it is by no means clear that "the value attributable to the loss of use of unpaid wages" is such a loss. *See id.* In contrast to such intangible losses as damage to reputation or emotional distress, the loss of the use of money during a specific period can be approximated with little difficulty by reference to the prevailing interest rates for the period. Thus, even under the Eighth Circuit's compensation analysis, it would seem that prejudgment interest could properly be awarded in addition to liquidated damages as an entirely separate element of compensation.